# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 3348 | **DATE** | 11/25/2002 |
| **CASE TITLE** | | Phillips vs. Mezera | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

## DOCKET ENTRY:

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due _____. Reply to answer brief due _____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Plaintiff's motion to expedite (Doc. No. 80-1) granted. Defendants' motion for summary judgment (Doc. No. 57-1) is granted. Judgment is entered in favor of Defendants and against Plaintiff on all claims.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | **Document Number** |
| | No notices required. | | number of notices | | |
| ✓ | Notices mailed by judge's staff. | | NOV 2 ___ | | |
| | Notified counsel by telephone. | | date docketed | | **81** |
| | Docketing to mail notices. | | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | 11/25/2002 | | |
| | | | date mailed notice | | |
| ETV | courtroom deputy's initials | | ETV | | |
| | | | mailing deputy initials | | |

Date/time received in
central Clerk's Office

| | |
|---|---|
| **GARFIELD PHILLIPS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | |
| ) | |
| **JOHN MEZERA, sued in his official Capacity** ) | |
| **as City Manager for the City of Joliet,** ) | |
| **JAMES SHAPARD, sued in his official** ) | |
| **Capacity as Deputy City Manager for The** ) | |
| **City of Joliet, JOYCE TOSO, sued in her** ) | **No. 00 C 3348** |
| **official Capacity of Property Maintenance** ) | |
| **Coordinator for the City of Joliet, MARY J.** ) | **Judge Rebecca R. Pallmeyer** |
| **KUCHARZ, sued in her Official Capacity as** ) | |
| **Assistant Corporation Counsel for the City** ) | |
| **of Joliet, CITY OF JOLIET, sued in its** ) | |
| **official Capacity as a home rule Municipal** ) | |
| **Corporations existing and operating Under** ) | |
| **the Laws of the State of Illinois, In the** ) | |
| **County of Will, 150 West Jefferson Street,** ) | |
| **Joliet, Illinois 60432,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Garfield Phillips ("Phillips") owned a two-unit apartment building in the City of Joliet.

Citing multiple uncorrected housing code violations, Joliet officials evicted Phillips' tenants in July

1998. In this lawsuit, Phillips alleges that Joliet officials violated his civil rights when they evicted

his tenants and interfered in the renewal of his HUD Section 8 Moderate Housing Contract. Those

named as Defendants include: John Mezera ("Mezera"), the City Manager for the City of Joliet;

Joyce Toso ("Toso"), the Property Maintenance Coordinator for the City of Joliet; Mary Kucharz

("Kucharz"), Assistant Corporation Counsel for the City of Joliet; and James Shapard ("Shapard"),

Deputy City Manager for the City of Joliet (collectively "Defendants"). On October 31, 2001, this

court dismissed all but two of Phillips' five causes of action against the City of Joliet and several



of its employees.[1] *Phillips v. Mezera*, No. 00 C 3348, 2001 WL 1345983 (N.D. Ill. Oct. 31, 2001). Defendants have now moved for summary judgment on the remaining two counts. Because Phillips is *pro se*, Defendants provided him with a notice describing the appropriate response to such a motion, and the matter is now fully briefed.

## FACTUAL BACKGROUND

The following facts are taken from the parties' Local Rule 56.1(a)(3) and (b)(3) Statements of Material Facts.[2] As filed, these Statements reflect the existence of a number of factual disputes, but, as explained below, the court concludes the disputes are not material to the outcome of this case.

Phillips, an African-American male, is the former owner of a two-unit dwelling at 26-28 Union Street in Joliet, Illinois. Until July 1998, Phillips had a HUD Section 8 Moderate Rehabilitation Housing Contract with the Housing Authority of Joliet ("HAJ").[3] His contract for 28 Union Street was terminated in July 1998 after the HAJ learned that Phillips' tenants had been evicted and his property condemned by Defendant City of Joliet ("Joliet"). Phillips provides a letter

---

[1]    Phillips complained in his original complaint that he was deprived of his property without due process of law and that city officials acted negligently with regard to his case. As explained in the court's earlier opinion, Phillips' own allegations defeated his due process claims, and he did not identify any legally cognizable tort claims. What survived the earlier motion to dismiss were Phillips's claims for violations of Sections 1981 and 1982 of the Civil Rights Act of 1866. The parties pursued discovery on those claims, and Defendants now seek summary judgment in their favor.

[2]    Phillips has objected to Defendants' Statement of Additional Material Facts, filed on August 1, 2002, arguing that this Statement is not contemplated by the court's rules. The court need not rule on this objection, however, because it need not consider Defendants' additional facts in order to conclude that Defendants are entitled to judgment. For purposes of this ruling, the court has considered only these materials: Defendants' Statement of Material Facts (hereinafter "Defs.' 56.1'"), Defendants' Supplement to Statement of Material Facts ("Defs.' Supp."), Phillips' Statement of Additional Material Facts ("Pl.'s 56.1 Resp."), and documents submitted in support of those statements.

[3]    Neither party has offered an explanation of the significance of such a contract, but the court understands that it authorizes Phillips to rent property to persons eligible for federally-subsidized housing.

from Joyce Johnson of the HAJ as evidence of the cancellation of his Section 8 contract. (Letter from Johnson to Phillips of 7/10/98, Ex. P to Pl.'s 56.1 Resp.) Because this letter, offered by Phillips as evidence of Defendants' wrongdoing, makes no mention of the Section 8 contract for 26 Union Street, the court concludes that for the purposes of this decision, only the contract for 28 Union Street is at issue. Phillips claims the eviction and condemnation of his property was a product of race discrimination by Joliet officials. He also claims the cancellation of his Section 8 contract made it impossible for him to make his monthly mortgage payments on the property, resulting in a foreclosure action. (Pl.'s 56.1 Resp. at 7.)

Joliet maintains that it inspects all rental housing within its corporate limits pursuant to the Code of Ordinances, without regard to the race of the property owner. In fact, Joliet officials do not maintain records indicating the race of property owners, and Defendants insist they do not take race into account in any official business. In particular, Defendants urge they did not take action in regard to 26-28 Union Street based upon Phillips' race, nor did they discriminate against Phillips. (*Id.* ¶¶ 16-21, 23-37; Defs.' Supp. ¶¶ 81-83, 86, 87, 89.)

As the uncontested facts show, Phillips purchased the two-unit rental property at 26-28 Union Street in December 1994. As part of the property transaction, Phillips became the holder of a fifteen-year HUD Section 8 Moderate Housing contract issued on April 1, 1985. (Pl.'s 56.1 Resp. ¶ 1.) Also received in the property transfer was a four-year Certificate of Inspection issued by the City of Joliet to the previous owner. (*Id.* ¶ 4.) On August 29, 1997, Defendant Joyce Toso sent correspondence to Phillips notifying him that an inspection of his property was scheduled for September 5, 1997. (Toso Aff. ¶ 12, Ex. 3 to Defs.' 56.1.) Due to Phillips' absence from the property, no inspection occurred on that date. (Defs.' 56.1 ¶ 43.) The record is silent as to the reasons for Phillips' absence; nor has either party explained what instructions, if any, Phillips was given about re-scheduling the inspection.

Phillips next received a Notice of Pending Closure Action from the City of Joliet dated

3

September 25, 1997, stating that if he failed to allow an inspection by October 6, 1997, his building would be posted unfit for occupancy. (Notice of Pending Closure Action of 9/25/97, Ex. 3 to Defs.' 56.1.) On October 6, 1997, Ken Alexander ("Alexander"), an inspector for the Neighborhood Services Department for the City of Joliet, inspected the property and found 34 code violations. (List of Violations from Inspection of 10/6/97, Ex. 3 to Defs.' 56.1.) Included among the violations were the lack of a smoke detector in one unit, a leaky faucet, windows that did not open or were broken, a defective guard rail on the porch, a defective stove, and various electric problems. (Emergency Action Notice of 10/10/97 and List of Violations from Inspection of 10/6/97, Ex. 3 to Defs.' 56.1.) On November 19, 1997, Phillips called Alexander and stated that he needed thirty days to make the repairs. A reinspection was scheduled for December 19, 1997.

For reasons again unexplained, Phillips was not present for the inspection on December 19. (Defs.' 56.1 ¶¶ 47, 48.) On January 28, 1998, Alexander returned to attempt inspection again, but again Phillips was not at the property (there is no indication whether he had been advised of this date). (Id. ¶ 49.) The same day, Toso issued another Notice of Pending Closure Action; that notice warned that unless Phillips corrected the violations before March 11, 1998, Joliet officials would post the building not approved for occupancy. (Id. ¶ 50.)

On March 11, 1998, Alexander inspected 26 Union Street and found that the violations in that unit had not been corrected. (Alexander Aff. ¶ 18, Toso Aff. ¶ 21, Exs. 2 & 3 to Defs.' 56.1.) Because neither Phillips nor the tenant was present at 28 Union Street, Alexander was unable to inspect that unit. Both properties were posted "[n]ot approved for occupancy." (Id.) On March 13, 1998, Toso issued a third Notice of Pending Closure Action indicating a full inspection had to be conducted by March 27, 1998. (Id. ¶ 52.) Also on March 13, Joliet officials advised Phillips' tenants that if their landlord failed to allow an inspection prior to March 27, 1998, the building would have to be vacated. (Notices of Pending Closure Action of 3/13/98, Ex. 3 to Defs.' 56.1.) Alexander inspected the property on March 27, 1998 and found 26 code violations, (Defs.' 56.1 ¶ 53), many

4

of them identical to those found on October 6, 1997. (List of Violations from Inspection of 3/27/98, Ex. 3 to Defs.' 56.1.)

On April 6, 1998, Toso sent a Notice of Property Maintenance Code Violations to Phillips indicating that his property had to be reinspected due to the code violations found on March 27, 1998. (Toso Aff. ¶ 24, Ex. 3 to Defs.' 56.1.) The mailing included a recommended procedure for correcting each of the 26 violations. (List of Violations from Inspection of 4/30/98, Ex. 3 to Defs.' 56.1.) The Notice explained that failure to correct the violations could result in legal action and notified Phillips that he had a right to a hearing concerning the violations, a right he could exercise by filing a written hearing request with the City Manager within 72 hours of receipt of the notice. (Letter from Toso to Phillips of 4/6/98, Ex. 3 to Defs.' 56.1.) Joliet officials also sent Phillips an invoice for $168.00 in reinspection fees. The April 6, 1998 invoice notes that Phillips previously owed the city $114.00, and currently owed $54.00, for a total of $168.00. (Rental Inspection Invoice for Reinspection of 4/6/98, Ex. 3 to Defs.' 56.1.) Defendants do not provide an explanation of how these figures were calculated, although Toso's letter of April 6, 1998 indicates that there is a $10.00 per unit charge for the first reinspection, with an $18.00 charge per unit for all subsequent reinspections. (Letter from Toso to Phillips of 4/6/98, Ex. 3 to Defs.' 56.1.) On April 21, 1998, Kucharz sent a Notice of Hearing to Phillips pursuant to Joliet ordinance 8-160.[4] There is no indication that Phillips himself requested the hearing; instead, it appears to have been scheduled at the initiative of city officials. (Notice of Hearing of 4/21/98, Ex. 4 to Defs.' 56.1.)

---

[4] Section 8-160(a) of the Joliet Code states, in relevant part, that "[i]f the city manager, after a hearing before the city manager or the city manager's designee determines that any person has failed to comply with this chapter, the city manager may suspend or revoke the certificate of inspection held by that person. Such a hearing shall be held not less than five (5) calendar days after notice of time, place and subject of the hearing has been received by the certificate holder at the holder's last known address or business address." The court assumes that a hearing must be held before the city manager or designee can revoke a certificate of inspection.

## A.      The April 29, 1998 Hearing

The City of Joliet Neighborhood Services Department conducted a hearing to revoke or suspend Phillips' Certificate of Inspection on April 29, 1998. (Defs.' 56.1 ¶ 55.) Phillips, Tozo, Assistant Corporation Counsel Mary Kucharz, and Deputy City Manager James Shapard participated in this hearing, (Defs.' 56.1 ¶ 56), with Shapard acting as the hearing officer. (Shapard Aff. ¶ 16, Ex. 6 to Defs.' 56.1 Supplement to Statement of Material Facts.) At the hearing, Phillips was advised (it is unclear by whom) to repair the property to cure the code violations and pay the outstanding fees for inspection so that he could get a Certificate of Inspection. (Defs.' 56.1 ¶ 55.) Phillips does not dispute this exchange, but adds that Shapard threateningly told him, "I'm gonna [sic] put you out of business, we're gonna [sic] shut you down!" and "I'm shutting you down, you're out of business!" (Phillips Aff. ¶ 9, (Ex. H to Pl.'s 56.1 Resp.) Shapard denies making such statements. (Defs.' 56.1 ¶ 57.)

## B.      After the April 29, 1998 Hearing

On April 30, 1998, Alexander inspected the property and found that no changes had been made to cure the existing code violations. (Defs.' 56.1 ¶ 58.) Defendants do not explain why the re-inspection occurred only one day after the hearing, nor do they suggest what Phillips might have done in a few hours to correct the deficiencies, but the court understands that Phillips was notified of the code violations on April 6, 1998, at latest. Phillips alleges that Toso told him he would not be given additional time to resolve the code violations and that the reason for shutting down the property was "payback" because Phillips re-rented his former 509 Sherman Street property.[5] (Phillips Aff. ¶ 10, Ex. H to Pl.'s 56.1 Resp.) On May 4, 1998, the city issued Phillips a Final Notice for Payment of Inspection Fees and Notice of Lack of Current Certificate of Inspection. (Id. ¶ 59.) The notice stated that rental inspection fees of $168.00 must be paid in full immediately, and

---

[5]      Neither party makes any further mention of property at 509 Sherman Street.

warned, "[s]hould you fail to pay the outstanding balance within that time, not only will your building be posted but your account will be sent to the City of Joliet Legal Department for legal proceedings in order to collect the balance due." (Final Notice for Payment of Inspection Fees & Notice of Lack of Current Certificate of Inspection of 5/4/98, Ex. 3 to Defs.' 56.1.) The following day, Phillips was sent another Notice of Property Maintenance Code Violations and a rental inspection invoice with a balance of $222.00 ($54.00 more than the previous balance of $168.00). (Defs.' 56.1 ¶ 60.) On May 26, 1998, Kucharz sent Phillips notice of a second hearing scheduled for June 3, 1998. (Id. ¶ 61.) On May 29, 1998, Alexander attempted to inspect the property but Phillips was not present. The record reflects that Phillips was notified about this inspection; the List of Violations from the April 30, 1998 inspection states that re-inspection was scheduled for May 29, 1998, as does the Rental Inspection Invoice of May 5, 1998. (List of Violations of 4/30/98 & Rental Inspection Invoice for Reinspection of 4/6/98, Ex. 3 to Defs.' 56.1.) Phillips has not explained why he was repeatedly unavailable for inspections of his property. Alexander was able to inspect 26 Union Street because the tenant was home, and found that conditions had not improved. (Defs.' 56.1 ¶ 62.) On June 1, 1998, Alexander posted the property (both units, the court presumes) as "[n]ot approved for occupancy" because of its poor condition and Phillips' failure to pay inspection fees. (Id. ¶ 63.)

## C.    The June 3, 1998 Status Hearing

The City of Joliet Neighborhood Services Division held a status hearing on June 3, 1998. Shapard presided; Phillips, Kucharz, Toso, and possibly City Manager John Mezera attended. (Defs.' 56.1 ¶ 64.) It is unclear who initiated the hearing, but Phillips received notice from Kucharz dated May 26, 1998. (Notice of Hearing of 5/26/98, Ex. 4 to Defs.' 56.1.) Defendants do not deny Phillips' claim that he paid the city $222.00 on June 3. (Phillips' Aff. ¶ 11, Ex. H. to Pl.'s 56.1 Resp.) At the status hearing, Shapard ordered the property to be posted and declared unfit for human habitation. Phillips claims that Shapard told him: "I can not reverse my decision, as a matter

7

of fact I spoke with Mezera and informed him that I condemned the building and Mezera jumped for joy." (*Id.* ¶ 12.) Phillips claims that Mezera was present and asked him "[w]here were you last night when you should have been having the violations corrected, watching the Bulls?" He apparently hurled several other insults at Phillips, and told Phillips to "[g]et a job. We want the building shut down because you're renting to gangbangers and they are selling drugs from that house." Mezera told Plaintiff that he was "gonna [sic] call [the Housing Authority of Joliet] and have your Section 8 certificate cancelled because there should not be any Section 8 tenants living in the 28 Union Street premises . . . . When you get some good tenants, you bring their names down here and the City will run criminal background checks to see whether or not your tenants are gangbangers." (*Id.* ¶ 13.) Mezera denies making such statements, and Defendants claim he was not even present at the hearing. (Defs.' Resp. ¶ 6; Defs.' 56.1 ¶ 40.)[6]

## D.    After the June 3, 1998 Hearing

The water at 26-28 Union Street was shut off accidentally on June 3, 1998 because an official had been misinformed that the property was vacant. The city corrected the problem within 24 hours. (Defs.' Resp. ¶ 15; Defs.' Resp. to Pl.'s First Set of Interrogatories ¶ 9, Ex. T to Pl.'s 56.1 Resp.) Phillips received a Notice of Emergency Condemnation from Toso dated June 4, 1998, stating that his property was again found to be in violation of the BOCA National Property Maintenance Code,[7] and that the property was going to be condemned. It is unclear whether Toso was referring to a particular inspection. The letter notified Phillips of his right to seek review of the decision by filing a written Notice of Appeal with the City Manager within 72 hours of receipt of the

---

[6]    If Mezera did in fact attend the hearing, the court expects Phillips would have questioned him concerning Shapard's statement that he "jumped for joy" on learning that the building had been condemned.

[7]    The parties do not identify BOCA, but the court understands this as a reference to the Model Codes adopted by Building Officials and Code Administrators International, Inc.

notice. (Notice of Emergency Condemnation of 6/4/98, Ex. 3 to Defs.' 56.1.) Phillips claims that on June 8, 1998 he presented Shapard with a Notice of Appeal, and Kucharz informed him that a hearing would be scheduled. (Pl.'s 56.1 Resp. ¶ 27.) There is no dispute that Joliet officials never contacted Phillips about a hearing. (Id. ¶ 29.)

On June 4, 1998, Toso sent Phillips' tenants notice to vacate the property because the city had condemned it as unfit for human habitation. (Defs.' 56.1 ¶ 65.) On June 5, 1998, Defendants claim that Phillips notified Toso in person at City Hall that he would fix the violations in 28 Union Street by the weekend and asked that the tenants be allowed to stay. Toso replied that all tenants would have to vacate the premises until the building was approved for occupancy. Defendants allege Phillips agreed to "go along" with forcing out the tenants at 26 Union Street. (Id. ¶ 66.) Phillips offers a different version of events, claiming that Toso told him there was "no problem" with the tenants staying in the 28 Union Street unit, but the city wanted the tenants residing in 26 Union Street evicted because they were a public nuisance. (Phillips' Aff. ¶ 17, Ex. H to Pl.'s 56.1.) Phillips claims that on June 6, 1998, Alexander told Phillips' tenants, Carlotta Osborne (28 Union Street) and Lawrence Travis (26 Union Street), that they had three days to move out of their units because the building had been condemned and the locks on the entrance doors were going to be changed. (Pl.'s 56.1 Resp. ¶¶ 25, 26.) Phillips claims that during the week of June 8-12, 1998, the original locks were removed and the doors at 26-28 Union Street were padlocked. (Id. ¶ 28.) Defendants counter that as of June 12, 1998, Phillips' tenants were still living at the address. (Defs.' Resp. ¶ 25.) Defendants deny ordering anyone to padlock the doors, and Phillips has offered no proof that events unfolded in this manner. (Defs.' Answer to Pl.'s First Set of Interrogatories ¶ 7, Ex. T to Pl.'s 56.1 Resp.) The parties agree that as of June 25, 1998, the building was vacant and posted with "no trespassing" signs. (Defs.' 56.1 ¶ 68.)

### E. Phillips' Contract with the Housing Authority of Joliet

Phillips claims that Defendants intentionally influenced the Housing Authority of Joliet ("HAJ") to terminate his Section 8 Moderate Rehabilitation Housing Contract. On June 5, 1998, Joyce Johnson ("Johnson"), Section 8 Housing Coordinator for the HAJ, allegedly told Phillips that she wanted the tenants in 26 Union Street to move out because they were a nuisance. (Phillips Aff. ¶ 16, Ex. H to Pl.'s 56.1 Resp.)[8] Phillips claims Toso told him the same thing that same day; she wanted the tenants residing in 26 Union Street to move. (Id. ¶ 17.)

A month later, Phillips received word from Johnson concerning the 28 Union Street unit. By letter dated July 10, 1998, Johnson stated: "According to the documentation received from the City of Joliet and the hearings held with yourself and the City of Joliet, you do not have an inspection permit to rent [28 Union Street] and the property is considered unfit for human habitation. Therefore, the Housing Authority of Joliet has not [sic] choice but to terminate you [sic] Moderate Rehabilitation Contract and use that funding to allow [the former tenant, Carlotta Osborne, who was forced out] . . . to relocate." (Letter from Johnson to Phillips of 7/10/98, Ex. P to Pl.'s 56.1 Resp.) Phillips blames the termination of his contract on Defendants, but apart from the statements in Johnson's July 10, 1998 letter, Phillips offers no evidence indicating that Joliet officials ever urged the HAJ to cancel his Section 8 contract.

Defendants maintain that the HAJ is not a department of the City of Joliet and the City has no control over the operations or employees of the HAJ. Defendants assert, further, that Mezera has no authority to terminate a contract between the HAJ and another person, and that neither Mezera nor any other Joliet official contacted the HAJ regarding Phillips' Section 8 contract. (Defs.' 56.1 ¶¶ 38-41.) Defendants do not recall having contacted Johnson regarding 26-28 Union Street, but they point out that Johnson sometimes attends City of Joliet administrative hearings regarding

---

[8]     The court notes that Defendants claim Phillips' Section 8 contract for 26 Union Street was terminated in March 1998. (Defs.' Resp. ¶ 34.)

real property. (Defs.' Answers to Pl.'s First Set of Interrogatories ¶ 5, Ex. T to Pl.'s 56.1 Resp.)

## F.    Events Since 1998

In May 1999, Joliet initiated legal action against Phillips and the Chemical Mortgage Company (presumably Phillips's mortgage lender) pursuant to Chapter 65 of the Illinois Compiled Statutes, as amended, Section 5/11-31-1 et seq. and Section 5/1113-15, and Section 8-122 et seq. of the Code of Ordinances of Joliet. (Complaint for Injunction, Demolition, and Other Relief, Ex. Z to Pl.'s 56.1 Resp.) Citing the property's history of disrepair, the City sought authorization to tear down the building. *(Id.)* In October 1999, the Circuit Court of the Twelfth Judicial Circuit, Will County, authorized Joliet to demolish the building at 26-28 Union Street, and ordered that the costs of abating the nuisance caused by the demolition be charged to the owner of the property. (Decree of Demolition, Ex. Z, Pl.'s 56.1 Resp.)

## DISCUSSION

## A.    Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Flores v. Preferred Tech. Group*, 182 F.3d 512, 514 (7th Cir. 1999). In determining whether factual issues exist, the court must view all the evidence in the light most favorable to the non-moving party. *Flores*, 182 F.3d at 514. An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Carter v. American Oil Co.*, 139 F.3d 1158, 1161 (7th Cir. 1998) (citation omitted). Only disputes that could affect the outcome of the suit under governing law will preclude an entry of judgment for the moving party.

## B.    Sections 1981 and 1982

In Counts I and II of his Second Amended Complaint, Phillips alleges violations of 42 U.S.C.

§§ 1981(a) and 1982, which guarantee that all citizens have the same rights as white citizens to make and enforce contracts (1981) and to lease and convey real property (1982). Section 1981 addresses racial discrimination in contractual relationships. As amended by the Civil Rights Act of 1991, the statute reads in relevant part:

> (a) All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens. . . .
> (b) For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.
> (c) The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981(a)-(b). Section 1982 deals with discrimination in property transactions. It states:

> All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

42 U.S.C. § 1982. Section 1982 was enacted to enable Congress to enforce the Thirteenth Amendment and, particularly, to prohibit all racial discrimination, private and public, in the sale and rental of property. *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 437 (1968).

Because of their common origin in the Civil Rights Act of 1866 and their common purpose, § 1981 and § 1982 are generally construed in tandem. *See Tillman v. Wheaton-Haven Recreation Ass'n, Inc.*, 410 U.S. 431, 439-40 (1973). A claim under either section is established when a plaintiff shows (1) he is a member of a racial minority; (2) the defendant had an intent to discriminate on the basis of race; and (3) the discrimination involved one of the activities enumerated in the statutes (i.e. making and enforcing a contract or owning property). *Morris v. Office Max, Inc.*, 89 F.3d 411, 413 (7th Cir. 1996). Defendants do not contest that Phillips is a member of a racial minority; rather, they argue that Phillips' claims fail under prongs two and three. Because Defendants' arguments concerning the third prong can be addressed readily, the court turns first to the issue of whether property or contract rights are involved here, and then addresses

12

the issue of intentional discrimination.

## 1. Do Phillips' Claims Involve Contract and Property Rights Contemplated By Sections 1981 and 1982?

Defendants argue that they did not interfere with Phillips' right to contract with the HAJ, nor did they deprive him of the right to own and hold 26-28 Union Street. They argue that because the HAJ is not a department of the City of Joliet and the city has no control over the policies and procedures of the HAJ, there can be no link between their actions and the cancellation of Phillips' Section 8 contract. Finally, Defendants argue that Phillips' claim under Section 1982 fails because they did not deprive him of the ownership of his property; rather, they condemned it. If Phillips ultimately lost his property due to mortgage foreclosure, this is beside the point, according to Defendants.

These arguments challenge not only the factual basis for Phillips's claims, but also their legal sufficiency. Because, as discussed below, Phillips has not offered evidence of intentional discrimination by Joliet officials, Defendants are entitled to summary judgment on these claims. The court therefore need not reach the factual issues of whether Joliet officials actually had authority to interfere with this HAJ contract or whether Phillips has presented evidence that they did take such action. To the extent that Defendants challenge the legal sufficiency of Phillips' claims, however, their objection will be overruled. Phillips alleges that Defendants improperly interfered with his relationship with the HAJ and urged the HAJ to terminate his Section 8 contract. This, according to Phillips, led directly to his inability to make mortgage payments and ultimately to the foreclosure of his property. Section 1981 proscribes not only discrimination by the contracting party (here HAJ), but also discriminatory interference by third parties. *Vakharia v. Swedish Covenant Hosp.*, 765 F. Supp. 461, 471 (N.D. Ill. 1991).

As for Phillips' Section 1982 claim, Phillips also alleges that racial animus led the Defendants to act in a manner that led to the condemnation and ultimately the sale of his property.

He essentially argues that Defendants deprived him of the right to "lease" his property, as mentioned in the statute. He also alleges that because his property was condemned and his Section 8 contract cancelled, he was unable to make mortgage payments which ultimately led to foreclosure. Again, putting the factual sufficiency of these claims to one side, the court concludes they do state claims within the scope of Sections 1981 and 1982.

## 2.    Did Defendants Intend to Discriminate Based on Race?

The more difficult question here is whether Phillips has presented evidence of intentional discrimination. In proving a Section 1981 or 1982 claim, a plaintiff may present either direct evidence of discrimination or may instead proceed on the indirect method of proof set forth in *McDonnell Douglas Corp. v. Green*.[9] 411 U.S. 792, 802 (1973). *See Sanghvi v. St. Catherine's Hosp., Inc.*, 258 F.3d 570, 577 (7th Cir. 2001) (applying *McDonnell Douglas* standard to a section 1981 contract case outside the employment context). Although Phillips asserts that Mezera and Shapard made insulting comments to him at the April 29 and June 3 hearings, he has not argued his case as one of "direct evidence," instead referring to the shifting-burdens method of proving a disparate treatment claim and comparing Defendants' treatment of him with the treatment accorded to five other property owners in Joliet. To succeed in this approach, Phillips must show that Defendants treated him less favorably than other property owners because of his race. *International Broth. of Teamsters v. U.S.*, 431 U.S. 324, 335, n. 15 (1977). As our Court of Appeals has explained in the employment discrimination context, Phillips is not required to show "complete identity" between himself and the persons with whom he compares himself, but he must show a "substantial similarity." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 618 (7th Cir. 2000).

Phillips alleges that Defendants were motivated by racial animus in bringing about the

---

[9]    Section 1981 and 1982 claims are subject to the same methods of proof as race discrimination claims under Title VII of the Civil Rights Act of 1964. *Johnson v. City of Fort Wayne*, 91 F.3d 922, 940 (7th Cir. 1996).

termination of his HUD Section 8 Moderate Housing Contract and interfering with Phillips' property rights in the rental units at 26-28 Union Street. To prove his case, Phillips claims that he was treated differently than five property owners - James Wyatt, Senovio Benavides, Al Stewart, Ronald Schultz, and Willard Majorsky - whom he claims are all white and all similarly situated to him. (Pl.'s 56.1 Resp., Ex. K1-K4.) Phillips claims Defendants followed a different set of procedures when the "white" property owners were cited for Joliet code violations than they followed when his property was involved. (Id.) Phillips states that when each of these property owners failed to fix the code violations, Defendant Kucharz, pursuant to Section 20-8 of the Code of Ordinances of the City of Joliet, initiated legal proceedings through the Circuit Court of Will County to secure a court order authorizing condemnation of their property. The court understands Phillips to say that he should have been brought to court before his property was condemned and his tenants existed.

Upon review of the record, the court concludes that the evidence is insufficient to establish Phillips' claim of disparate treatment. First, Phillips presented no evidence that Joliet officials kept records of the racial backgrounds of property owners. In fact, Phillips himself has not offered any proof of the race of the individuals he claims received different treatment. The closest he comes to meeting this burden is presentation of two affidavits of proof of service on James Wyatt. In one of these, the affiant notes that Wyatt's race is "C," for Caucasian. In the other, the notation reads "W," for white. (Affidavits of Proof of Service 7/27/95 and 11/27/96, Ex. K1 to Pl.'s 56.1 Resp.) Although this is sufficient, for purposes of summary judgment, to establish that Wyatt is white, it does not prove that City of Joliet officials kept records of property owners' race, nor does it prove that race motivated city officials' actions.

Nor does the court believe Phillips has met his burden of showing that the five property owners were treated more favorably than he. Phillips points, first, to the case of Willard Magosky, owner of the Woodcreek Mobile Homes park, and argues that Magosky received more favorable treatment than he did. In 2000, Magosky got into trouble with Joliet officials because he failed to

honor a 1997 annexation agreement with the city in which he agreed to correct environmental infractions by connecting the trailer park to the municipal sewer system. (Guy Tridgell, *City Won't Budge in Trailer Fight*, HERALD NEWS, June 23, 2000, at A1, Ex. K4 to Pl.'s 56.1 Resp.) His trailer park was also cited for numerous code violations. (*See* Lists of Code Violations, Ex. K4 to Pl.'s 56.1 Resp.) Based on the evidence supplied by Phillips, however, the court fails to see how Magosky received better treatment. Toso sent Magosky a Notice of Emergency Condemnation on April 4, 2000 stating that due to the severity of the violations on his property, "the building or affected part has been condemned, placarded, declared unfit for human habitation and must be vacated immediately and cannot be reoccupied until all violations are corrected." The letter notified Magosky that if he and his tenants failed to vacate the premises, a complaint and summons would be issued for him to appear in the Will County Circuit Court. (Notice of Emergency Condemnation of 4/4/00, Ex. K4 to Pl.'s 56.1 Resp.) In June 2000, Richard Bazzarone, Director of Inspection Services for the City of Joliet, ordered Magosky and his tenants to vacate the property. (Notice of Unfitness for Occupancy and Order to Vacate of 6/14/00, Ex. K4 to Pl.'s 56.1 Resp.) On June 14, 2000, City inspectors posted the individual trailers and the entire park with a Notice of Unfitness for Occupancy and an Order to Vacate the property. On June 22, 2000, Deputy City Manager Shapard presided over a hearing to determine whether arguments against the postings had merit. (Letter from Shapard to Magosky of 6/22/00, Ex. K4 to Pl.'s 56.1 Resp.) Shapard determined that the posting of the trailer park and individual trailers were valid and upheld the notices and order to vacate. (*Id.*) An article that Phillips himself supplied the court indicates that the city closed the trailer park on July 14, 2000. (Guy Tridgell, *City Won't Budge in Trailer Fight*, HERALD NEWS, June 23, 2000, at A1, Ex. K4 to Pl.'s 56.1 Resp.)

Phillips has not provided the court with evidence that Joliet officials proceeded in court against Magosky before condemning his property and ordering his tenants to vacate. Instead, from this record it appears that both Phillips and Magosky were treated in the same way. Phillips was

cited for code violations, two hearings were held, and his property was condemned. Magosky's case followed a similar path. His property was condemned, a hearing was held, and his trailer park was closed. This evidence does not support Phillips's claim that Magosky received different, more favorable treatment.

Evidence concerning James Wyatt is similarly unconvincing. Phillips has provided evidence that James Wyatt owned several properties in the City of Joliet from at least the late 1980s through 2001. Numerous complaints were filed against Wyatt by City of Joliet inspectors for failing to abate code violations and for renting his properties without a valid certificate of inspection. (*See generally* Ex. K1 to Pl.'s 56.1 Resp.) Multiple inspections were conducted of Wyatt's properties, and Wyatt was cited for several code violations over several years. Apparently some of Wyatt's properties were deemed eligible for Certificates of Inspection, although it is not clear whether Wyatt ever paid his overdue fines necessary to receive the certificates. (*See* Final Notice for Payment from Reuben Arthur, Property Maintenance Coordinator of the Neighborhood Services Division of the City of Joliet to Wyatt of 9/16/93, Ex. K1 to Pl.'s 56.1 Resp.) On at least one occasion one of Wyatt's properties was condemned. (*See* Notice to Tenants to Vacate Unsafe Property of 1/18/96, Ex. K1 to Pl.'s 56.1 Resp.)

Phillips has not provided the court with information about what ultimately happened in Wyatt's court cases. Regardless of their outcomes, however, the process Wyatt received from the city hardly seems enviable. Phillips claims that none of Wyatt's tenants were ever evicted, nor was his property condemned, nor his water shut off. With regard to the first two contentions, Phillips has himself provided the court with evidence to the opposite effect. (*See* Notice to Tenants to Vacate Unsafe Property of 1/18/96, Ex. K1 to Pl.'s 56.1 Resp.) Phillips has also provided the court with evidence of at least 20 court actions filed against Wyatt over the course of approximately nine years. (*See generally* Ex. K1 to Pl.'s 56.1 Resp.) To overcome Defendants' motion for summary judgment, Phillips has to prove that he was treated less favorably than similarly situated individuals.

17

*International Broth. of Teamsters*, 431 U.S. at 335, n. 15. Assuming Wyatt and Phillips are similarly situated, the court is at a loss to understand why Phillips, who had two hearings and several opportunities to improve his property, believes he was treated less favorably than Wyatt.

Phillips provides even less material on Benavides, Stewart and Schultz, not enough for the court to conclude whether they were similarly situated to Phillips or whether they received better process from the city. Defendants explain that the legal actions against the property owners cited by Phillips were filed pursuant to Section 20-3 of the Code of Ordinances of the City of Joliet, in which a citizen or tenant may file a complaint, which then leads to an inspection by the City. JOLIET, ILL. CODE § 20-3. Section 20-1 states "[t]his chapter is intended to establish a supplemental procedure for the abatement of nuisances and is not intended to supplant any other procedure set forth by law or ordinance. . . ." *Id.* § 20-1. In Phillips' case, Defendants, urge, inspections were prompted not by citizen complaints, but by the language of Section 8-152 of the Joliet Code, which requires that "two-family dwellings. . .shall be inspected systematically for compliance with this Code and all other applicable laws." *Id.* § 8-152. The law makes a number of exceptions, none of which Phillips argues apply to him. Phillips does not rebut Defendants' argument that Section 8-152 required them to inspect his property, and that because no citizen or tenant filed such a complaint against Phillips, Section 20-3 is irrelevant to the case at hand. [10]

City of Joliet officials did eventually proceed in court against Phillips pursuant to Section 20-8 of the Code of Ordinances of Joliet and 65 ILCS 5/31-11-1(a), fourteen months after Phillips claims the city evicted his tenants, to secure an order authorizing the demolition of the property. (Complaint for Injunction, Demolition, and Other Relief, Ex. Z to Pl.'s 56.1 Resp.) The complaint

---

[10]     The court notes that in some instances, the individuals who filed complaints in the cited cases were inspectors for the City of Joliet, including inspector Alexander, the same individual who inspected Phillips' property. (Complaint against James Wyatt of 11/6/96, Ex. K1 to Pl.'s 56.1.) This fact does not defeat summary judgment, however, where Phillips has not demonstrated that Alexander's "citizen's complaint" against Wyatt resulted in more favorable treatment than Phillips received as a target of Alexander's statutorily-mandated inspection.

18

alleged that the property was abandoned and for various reasons constituted a public nuisance and a dangerous structure. (*Id.*) Phillips is apparently arguing that he should have been taken to court before his property was condemned or his tenants evicted, but as noted, the court is not convinced this procedure was followed with respect to Magosky or Wyatt. Phillips has not provided the court with evidence establishing that Joliet's policy for dealing with code violations in the mid-to-late 1990s was to initiate legal action pursuant to Section 20-3 prior to condemning property or evicting tenants. For the foregoing reasons, the court concludes that Phillips has not provided sufficient evidence to show he was treated less favorably than the other property owners he cites.

Phillips points to other actions taken by Defendants to prove he was the victim of racial discrimination. He alleges that there was no reason for Defendants to inspect his building when they did because his inspection certificate was valid until November 23, 1998. The implication is that Defendants purposely sent an inspector to harass him. The language of the certificate Phillips relies on itself defeats this argument, however. The certificate of inspection provided to the court states that "[t]his Certificate expires on the above date [11/23/98] unless sooner suspended or revoked. This Certificate is not a representation, warranty, or guarantee that the dwelling inspected meets all of the requirements for such dwellings." (Certificate of Inspection, Ex. A to Pl.'s 56.1 Resp.) The language "unless sooner suspended or revoked," if it means anything, must mean that interim inspections were anticipated. In any event, even if Phillips is correct that the certificate can be interpreted as excusing his property from any inspections for a four-year period, he has not demonstrated that the City's decision to conduct an inspection several months earlier was the product of racial discrimination.

Phillips' final piece of evidence in support of his claims is a post-hearing letter to Al Stewart (one of the allegedly white property owners), informing Stewart of the determinations made at his March 15, 2001 hearing to discuss the nonpayment of rental inspection fees. (Letter from Shapard to Stewart of 3/20/01, Ex. G to Pl.'s 56.1 Resp.) Phillips complains that he did not receive this

"customary" post-hearing letter. Defendants counter that the correspondence sent to Al Stewart was not customary in 1998, when Phillips' hearings took place. (Defs.' Resp. ¶ 12.) Phillips does not provide evidence to controvert this assertion.

## CONCLUSION

Accepting Phillips' rendition of the facts as true, the court concludes that he has not met his burden of proving a prima facie case of racial discrimination. Although he has successfully shown that he is a member of a racial minority and that his claims fall within the purview of Sections 1981 and 1982, Phillips has not shown discriminatory intent on the part of city officials. *Morris*, 89 F.3d at 413. Phillips has never challenged the accuracy of the inspection reports showing that his rental property suffered from numerous uncorrected code violations. Nor has he demonstrated that Joliet officials accorded more favorable treatment to similarly situated white property owners. Summary judgment for Defendants Mezera, Toso, Shapard and Kucharz is therefore appropriate. Because none of the city officials can be found liable, summary judgment must also be granted to Defendant City of Joliet.

ENTER:

Dated:  November 25, 2002

REBECCA R. PALLMEYER
United States District Judge